# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MATTHEW BROWN,<br><br>                              Plaintiff,<br><br>              v.<br><br>PROVE IDENTITY, INC.<br>and RODGER DESAI,<br><br>                              Defendants. | Case. No.<br><br>**COMPLAINT**<br><br>**JURY DEMANDED** |

Plaintiff, Matthew Brown ("Brown"), for his Complaint against Defendants, Prove Identity, Inc. ("Prove") and Rodger Desai ("Desai"), alleges as follows:

## INTRODUCTION

1.      This case arises out of Brown's rights to exercise valuable stock options in Prove and Defendants' wrongful efforts to prevent Brown from exercising those rights, either in breach of Prove's contractual obligations or constituting common law and federal securities fraud.

## PARTIES

**A.      Plaintiff Matthew Brown**

2.      Brown is a U.S. citizen who resides in London, England. He was a full-time employee of Prove from March 2013 until January 2018, ending his tenure as Vice President of Product & Engineering. He then agreed to continue his service to the company as a consultant.

**B.      Defendant Prove Identity, Inc.**

3.      Prove, formerly known as Payfone, is a Delaware corporation that at all relevant times had its principal place of business in New York, New York. Prove is a late-stage

technology startup that develops and sells identity-verification services to online businesses. Using the technology that Prove has developed, a company such as PayPal or eTrade can expedite onboarding of new customers.

### C.   Defendant Rodger Desai

4.      Desai is the founder and Chief Executive Officer of Prove. At all relevant times Desai has lived in New York, New York.

### JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332 and 1367, and 15 U.S.C. § 78aa; Defendants are domiciled in New York, New York, and the parties' relevant conduct occurred in New York, making Defendants subject to the Court's personal jurisdiction; and venue is proper under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2).

### FACTUAL ALLEGATIONS

### A.  Prove Awards Brown 200,000 Stock Options

6.      In connection with accepting his full-time employment in March 2013, Prove granted Brown options to acquire 25,000 shares of common stock. Over the next four years, Prove granted Brown options for another 175,000 shares. A summary of the 200,000 options thus granted to Brown (the "Options") is set forth below:

| Date of Grant | Number of Options | Exercise Cost |
|---|---|---|
| March 6, 2013 | 25,000 | $17,500 |
| November 19, 2013 | 10,000 | $7,800 |
| June 4, 2014 | 70,000 | $54,600 |
| September 24, 2014 | 45,000 | $35,100 |
| September 13, 2016 | 50,000 | $64,500 |
| **Total** | **200,000** | **$179,500** |

7.     These option grants were each memorialized in a Notice of Stock Option Grant (each a "Notice" or "Option Grant Notice") that set forth, among other things, the type of option, the exercise price per share, the date of grant, and the vesting schedule.

8.     The Option Grant Notices were and are enforceable contracts between Prove and Brown, and the Notices provided that Brown's Options would expire ten (10) years after the date of grant, meaning that the first options would expire in 2023.

9.     The Notices were also subject to earlier expiration: Section 6(b) of each Notice stated that Brown's Options would generally terminate on "[t]he date three months after the termination of [Brown's] Service for any reason other than Disability." Section 14(d) of each Notice defined "Service" to mean "service as an Employee, Outside Director or Consultant."

**B. Brown Ends His Full-Time Employment with Prove**

10.     Brown worked as a full-time employee of Prove until January 2018, spearheading the development of the company's identity-verification product and helping to grow Prove into a market leader at the time of his departure.

11.     In January 2018, Brown decided that he wanted to move to London and broaden his career focus. He accepted a position at startup Voxbone as Vice President of Product. He also planned on growing his personal website, mateocafe.com, into a platform for news and ideas about the world of tech startups.

12.     When Brown decided to end his full-time employment with Prove, he had approximately 153,646 vested Options and 46,354 unvested Options. He proposed to exercise the Options, which by that time were already worth millions of dollars. In January 2018, Brown approached Desai, the company's founder and CEO, because he reported directly to Desai at that time.

13.     Brown told Desai about his decision. They discussed Brown's and the company's future. Desai appeared to be happy for Brown and did not object to his decision to end his full-time employment with Prove.

14.     Desai explained to Brown, however, that his departure came at an inopportune time, because Prove was raising its Series F fundraising round, and Desai had concluded that the departure of a key executive at the time would send the wrong signal to potential investors.

15.     Accordingly, on behalf of Prove, Desai asked Brown to continue as a "Consultant" under the terminology of the Notices, and to maintain a public image of continued full-time employment. Desai and Brown discussed and agreed that by continuing as a "Consultant," Brown's "Service" to Prove, under the Notices, would continue: they agreed that the vested Options would not terminate, the unvested Options would continue to vest, and Brown could exercise the Options in the future.

16.     Desai's foregoing representations and agreement on behalf of Prove, which incorporated by reference the Option Grant Notices, was the only consideration that Brown and Desai agreed to, or even discussed, in exchange for Brown's continued Service as a Consultant (the "Consulting Agreement"). When the parties entered into the Consulting Agreement, there was a possibility that it would be fully performed within one year, by January 2019.

17.     The Consulting Agreement was valuable to Brown. It meant that by ending his full-time employment, he did not have to exercise the vested Options within three months of his departure (on pain of forfeiture) at an aggregate exercise price of over $125,000; and that his unvested Options would continue to vest.

18.     As the company's CEO, Desai possessed full power and authority to enter into the Consulting Agreement on behalf of Prove. It was known to Brown and other Prove employees

that Desai had previously made hiring and firing decisions without approval from any other person, including by hiring Desai's own family members. In addition, throughout his full-time employment, the company had put Desai into positions in which he acted with the full power and authority to enter into such consulting agreements. The deal was done.

### C. Desai Commits in Writing to Extend Brown's Options Exercise Window

19.     Brown's last day of full-time employment with Prove was on January 18, 2018. Under the Consulting Agreement, Brown thereafter continued to provide Service to the company as a Consultant, remaining integrated in the workflow within his old department. In fact, Desai personally assigned work to Brown, emailing colleagues on February 2, 2018, to tell them: "BTW, Matt B is on this and will help review."

20.     Prove sells products to banks and other financial institutions and therefore is required to comply with International Organization for Standardization ("ISO") security standards, and other contractual privacy and security standards that require the company to recover work laptops from all departing employees.

21.     Consistent with the Consulting Agreement, Prove has never asked Brown to return his work laptop; and he continued to provide his consulting Service to Prove after he moved to London and started his new job with Voxbone.

22.     The deadline for Brown to exercise his vested Options, if not for the Consulting Agreement, fell on April 18, 2018. As that deadline approached, without knowing whether such a writing was required as a legal matter, Brown followed up with Desai to have the company reduce the Consulting Agreement to writing.

23.     On March 15, 2018, Brown sent a text message to Desai saying: "Hey Rodger, Matt Brown. This is my UK mobile number. Have you had a chance to work on the advisory

paperwork? I want to make sure we get that in place before the 90 days runs out. And let me know if I can be of help in any way." In light of his prior discussions with Brown, and as the CEO of a tech company, Desai knew that when Brown wrote about 90 days running out, he was referring to the three-month window to exercise his vested Options.

24.     Desai responded by text less than an hour later, referring to Prove's CFO Tom FitzSimmons: "hi Matt / let me check with Tom but we'll get it done."

25.     Desai reaffirmed his commitment to Brown in another text message, two weeks later: "Need to get your paperwork to you as well." Desai thus twice promised and assured Brown that the paperwork reducing the Consulting Agreement to writing was on its way.

### D.  Desai Sets the Stage for Defrauding Brown

26.     After receiving Desai's written assurances, Brown continued his consulting work for Prove. Brown wanted the Consulting Agreement to be reduced to writing sooner rather than later, but he was not particularly concerned with the delay. He had already entered into the Consulting Agreement and recognized that Desai was busy running the company. In Brown's experience, wrapping up paperwork sometimes fell through the cracks, but Desai and Prove kept their word. Brown had no reason to suspect that this time would be different.

27.     Brown nonetheless took note as it came up on three months after his resignation. On April 9, 2018, Brown drafted an email to Desai with the subject line "Advisor Letter & Catch up." Brown wrote: "Hi Rodger, Hope all is well. Sorry I missed you last week. Any luck on the Advisory paperwork? I believe we're up against the deadline on my options, so I'd like to get that bottomed out in the next couple days. Who can I work with on this? Also, how's your calendar for Friday look to catch up? Matt."

28.     Brown followed up three days later in another text message: "Hey Rodger, any word on the paperwork? Sorry to push but we need to get this bottomed out. I'll be in Chicago and SF mid May if you're around. LMK." In response to this latest text, against referring to FitzSimmons, Desai wrote: "Hey man … Tom wants to just just [sic] know the scope of what u will do for us as advisor. Lets put 3 bullets together and then I can send it over."

29.     On April 16, 2018, Brown sent Desai an email with the subject line "Advisor: Action Plan," listing seven different consulting tasks Brown could do for Prove in separate bullets. Brown followed up the next day by text, referring to Prove's board of directors: "Hi Rodger, any questions on the email I sent over re: what I'll do as an advisor? I understand there is a board meeting tomorrow. If for whatever reason we're unable to finalize the deal, I'd like to ask for an extension on my options so I can work out how to purchase." Desai replied to Brown's text message with reassurance: "of course / but we have it for approval." By "it," Desai was referring to reducing the Consulting Agreement to writing. By promising that the board of directors would approve the reduction of the Consulting Agreement to writing, Desai had set the stage for his fraud.

**E.  Desai and Prove Defraud Brown**

30.     April 18, 2018, as noted, was the date of the board meeting that Desai and Brown had repeatedly discussed in their texts and the last day for Brown to exercise his Options within the three-month time-period under the Option Grant Notices if Brown were deemed not to have been continuing to provide Service to Prove as a Consultant.

31.     On April 18, 2018, Desai texted Brown noting how busy he was: 'board meeting today so been busy." Brown texted Desai back, referring to the board meeting and asking:

"How'd it go today." Desai responded in separate texts. First he wrote "good," then—evidently recognizing the ambiguity in that first response—he followed up moments later: "all set."

32.     Desai thus intended to and did convey, and Brown reasonably understood Desai to have conveyed, that reducing the Consulting Agreement to writing had come before the board and that the board had approved doing so. According to the information that Prove provided to Brown earlier this year, however, the board in fact had not agreed to reduce the Consulting Agreement to writing on April 18, 2018. That is, when Desai told Brown that the deal was "all set," that was a lie.

33.     Desai and Prove would extend and compound this lie over the next three and a half years, by repeatedly promising but failing to reduce the Consulting Agreement to writing while requesting and receiving Service from Brown and otherwise treating him as a Consultant, and by doing so with no intention of honoring his Options.

**F.  The Parties Continue Their Performance Under the Consulting Agreement**

34.     In reliance on Desai's statement that reducing the Consulting Agreement to writing was "all set," Brown continued upholding his end of the Agreement. Brown remained active, sending and receiving emails about Prove business.

35.     On June 13, 2018, Brown emailed Desai saying: "I'd like to come back to the Advisory agreement. Who can I work with to close out the paperwork? Matt." In response, Desai reaffirmed the Consulting Agreement and the parties' continued course of performance thereunder by copying Melissa Lockhart, Prove's Director of People, and telling her: "Melissa - see below, let's get this completed."

36.     Brown waited three days for Lockhart to follow up. She did not. On June 20, 2018, Brown wrote to her: "Hi Melissa, Hope all is well. Let me know what you need from me to close this out. Thanks." Brown received no response but continued his consulting work.

37.     On September 1, 2018, Brown emailed Desai again, copying Lockhart, and referring to the Options: "This is a lingering open item on my to do list. Would it be easier if I bought out the options?" Desai did not respond.

38.     Brown continued to rely on Desai's assurance that the Consulting Agreement would be reduced to writing and Desai's apparent instruction to Prove's Director of People to complete that work. Brown continued to provide substantial consulting Service to Prove between September 1, 2018, and April 2020

39.     At this point, although Brown was annoyed by Desai's lack of responsiveness, he reasonably concluded that Desai was simply overwhelmed by the burdens of running a fast-growing startup and would get to it.

**G.  Brown Continues His Performance Under the Consulting Agreement As He Looks for New Full-Time Employment**

40.     In November 2020, Bandwidth Inc. acquired Voxbone for $519.4 million, ending Brown's full-time employment with the company. He began exploring his next move. In January 2021, he reconnected with Desai over the possibility of increasing his Service to Prove. Accordingly, they set up a call for January 25, 2021.

41.     The call on January 25, 2021, was a far-ranging discussion. Among other things, again confirming the parties' continuing course of performance under the Consulting Agreement, Desai offered Brown a job as Vice President of Sales Engineering and proposed several consulting projects. Desai followed up via email on the same day to keep the discussion going.

9

42.     Brown replied on February 16, 2021, detailing project ideas but concluding that he would not be able to commit to Prove full-time and would have limited availability. Brown wrote: "For the above, we can do whatever makes sense. Perhaps we keep it simple and formalize the handshake advisory agreement we had when I left--I likely I owe you some work as part of that arrangement."

43.     In response to this note, Desai again did not dispute the formation and existence of the Consulting Agreement. Consistent with Brown's statement to Desai that he still "owed" work under the Consulting Agreement, Brown resumed his consulting Service.

44.     In particular, throughout February and March 2021, Brown communicated with Desai, Prove's Chief Strategy Officer (Michael Lynch), and various Prove employees about several new business opportunities for Prove, including building a private mobile virtual network operator and building a secure messaging service to replace SMS messaging.

45.     Desai participated in these conversations and never addressed or disputed Brown's statement that they had an existing deal under the Consulting Agreement or that Brown's continued work was Service that he owed Prove under that Agreement.

**H.  Defendants' Efforts to Give Brown the Runaround Intensify**

46.     The events leading to Brown's discovery of Defendants' fraud began in approximately June 2021, when Brown determined that for tax purposes, it made sense to exercise his Options. On June 21, 2021, Brown emailed Desai: "I may want to buy out my vested options that carried over under the advisory agreement. What's the best way to do this?" Desai did not respond.

47.     Brown continued his consulting Service. On June 29, 2021, for example, Brown and a Prove employee attended a conference call with a representative of Tango Networks. They

discussed ways that Tango Networks could help Prove with its identity-verification products, by gathering biometric and personal data from potential customers. Prove employee Aditya Khurjekar thereafter emailed Brown and Tango: "Andrew, Matt – another good call today!"

48.     The next day, June 30, 2021, Brown again emailed Desai about the Options. Desai referred Brown to Sandra McNeill, Prove's Senior Vice President of People. McNeill kept the runaround going, referring Brown to the finance department.

49.     On July 12, 2021, Brown emailed Gene Keenan, Prove's Senior Vice President of Finance, about exercising the Options. He received no response.

50.     On July 19, 2021, Brown followed up with Keenan again. This time Keenan responded: "hi Matt let me know what you are trying to do - how many options, vesting date etc." Brown replied the same day indicating that he wanted to exercise all of his Options and linking to a spreadsheet with full details.

51.     Keenan replied the next day, July 20, 2021, asking if FitzSimmons, Prove's CFO, was aware of those details. Brown then immediately emailed FitzSimmons, repeating the same request to exercise his Options. A week went by with silence from FitzSimmons.

52.     On July 27, 2021, Brown again emailed FitzSimmons, asking who the best person was to work with on his Options exercise. Another week went by with no response.

53.     Brown was reaching the point of exasperation. On August 2, 202, he emailed FitzSimmons and Desai, stating: "Following up on this. Perhaps it's easier if we jump on a quick video call so I can walk you through what I'm looking to do. Can you let me know a couple of times that work for you? I'll work around your availability. I'm genuinely not trying to be a pain, so if you need me to flex on timing, etc I'm happy to discuss." Brown's email was met with silence for six more days.

11

54.     On August 8, 2021, Desai emailed Brown promising that he would talk to FitzSimmons "on Monday" and reassuring Brown that Desai could "get to the bottom of this." Then another month passed.

55.     On September 5, 2021, Brown pleaded with Desai again. Desai then emailed someone named Dimitre Boyukliev, Prove's Chief of Staff, who had joined the company only one month earlier, and asked him to add Brown's request to a list of "admin items to talk to Tom about tomorrow."

56.     Yet two more weeks went by in which Brown heard nothing from Desai or FitzSimmons. During this time, Brown continued his consulting Service, including on such matters as how Prove could acquire more call-verification business.

**I.   Brown Discovers Defendants' Fraud**

57.     Prove and Desai were ultimately unable to keep up the lie. On December 2, 2021, Brown emailed Desai and FitzSimmons about the Options yet again. This time, Desai responded by claiming that the exercise window had expired.

58.     Brown replied thirteen minutes later pointing out that Desai had told him in August 2018 that the board of directors had approved reducing the Consulting Agreement to writing and that the Option exercise window had not terminated. Brown suggested that Desai go check the minutes of that meeting. Desai went silent again.

59.     A reasonable inference is that the board minutes would not have reflected any discussion of the Consulting Agreement—confirming that Desai had lied to Brown in April 2018 when he said that reducing the Consulting Agreement to writing had come up for board approval and was "all set."

60.     When Brown emailed Desai again, on February 14, 2022, Desai now referred the matter to Prove's General Counsel, Melanie Grace, who promised that she would "get back to [Brown] later today on a path forward."

61.     There was to be no "path forward." Grace emailed Brown later that day, sloppily, to inform him of Prove's final position: "You did not exercise your options with [sic] 90 day [sic] of departing from the company, which was three years ago. The options were cancelled and there are no options to exercise. This is the company's position. If you would like to discuss this matter in greater detail, please have your lawyer contact me. / Thank you – Melanie." Grace reconfirmed Prove's final position on February 23, 2022.

## CLAIMS FOR RELIEF

### COUNT I – BREACH OF CONTRACT
### (THE OPTION GRANT NOTICES)
### (Against Prove)

62.     Plaintiff incorporates the allegations above.

63.     The Option Grant Notices are valid and enforceable contracts.

64.     Plaintiff performed all of his obligations under the Option Grant Notices.

65.     As of the date that Brown sought to exercise the Option Grant Notices, he remained in the "Service" of Prove. The Options therefore had *not* expired but instead were in full force and effect in accordance with the terms of the Option Grant Notices.

66.     Prove failed to perform its obligations under the Option Grant Notices, by anticipatorily breaching and refusing to honor the Option Grant Notices.

67.     In the alternative, if Brown's consulting work for Prove did not constitute "Service" to Prove within the meaning of the Options Grant Notices, such that the window within which to exercise the Options had expired, then Prove's conduct equitably estops Prove

13

from precluding Plaintiff from enforcing his rights under the Option Grant Notices to exercise his Options.

68.     Defendants deliberately or recklessly misrepresented that Prove's board of directors had agreed to reduce the Consulting Agreement to writing, such that Prove would recognize Plaintiff as continuing in "Service" to Prove and as being entitled to exercise his Options within three months of the end of his Service under the Notices.

69.     Defendants deliberately or recklessly omitted to inform Plaintiff that the board either had concluded that the Consulting Agreement was not an enforceable contract or else had not considered the issue at all. To the extent the options exercise window expired, Defendants' misconduct, including their course of performance, induced Plaintiff not to seek to exercise his Options within the period of time by which he was obligated to exercise them under the Option Grant Notices.

70.     To the extent the options exercise window expired, Plaintiff reasonably relied on Defendants' misrepresentations and course of performance in not undertaking to exercise his Options within the period of time by which he was obligated to exercise them under the Option Grant Notices.

71.     The Option Grant Notices also imposed on Prove a duty of good faith and fair dealing, obligating Prove not to do anything that would have the effect of injuring, impairing, or destroying Plaintiffs' rights to receive the benefits of those agreements.

72.     For Prove, the primary purpose of the Consulting Agreement was to prevent potential investors from raising concerns over the departure of Brown as a key executive. Through Brown's continued Service as a Consultant, Prove received the benefit of the bargain and in fact closed its series F financing in February 2018.

73.     For Brown, the Consulting Agreement served to confirm Prove's agreement that it would recognize the extension of Brown's Options exercise window under the Option Grant Notices and allow his unvested Options to fully vest.

74.     Prove breached the implied covenant of good faith and fair dealing by refusing to document or have the board reduce to writing or ratify the Consulting Agreement, by refusing to return Brown's emails, by ignoring Brown's requests to exercise the Options, and ultimately by refusing to honor the Options. Prove's conduct was dishonest and objectively unreasonable.

75.     Accordingly, Plaintiff is entitled to the value of his benefit of the bargain under the Option Grant Notices—namely, the value of his Options if he had been permitted to exercise them at the time that Prove refused to permit him to exercise them.

**COUNT II – BREACH OF CONTRACT**
**(THE CONSULTING AGREEMENT)**
**(In the Alternative)**
**<u>(Against Prove)</u>**

76.     Plaintiff incorporates the allegations above.

77.     If Prove did not breach the Stock Options Grants, then the Consulting Agreement was and is an enforceable contract under which the parties intended to and did extend Plaintiff's deadline to exercise the Options until three months of the end of his Service to Prove as a consultant.

78.     Plaintiff performed his obligations under the Consulting Agreement, by rendering Service as a Consultant to Prove thereunder.

79.     The parties' course of performance confirms that they regarded the Consulting Agreement as having been formed and as a binding contract.

80.     Prove materially breached the Consulting Agreement by refusing to treat it as extending Brown's Service to Prove under the Option Grant Notices, in response to Plaintiff's attempt to exercise his Option rights during his term of Service.

81.     Plaintiff is entitled to the value of the benefit of his bargain under the Consulting Agreement—namely, the value of his Options if he had been permitted to exercise them at the time that Prove materially breached the Agreement.

### COUNT III – COMMON LAW FRAUD
#### (In the Alternative)
#### (Against Defendants)

82.     Plaintiff incorporates the allegations above.

83.     If the Consulting Agreement is not an enforceable contract, and if Plaintiff is not permitted to enforce his rights under the Option Grant Notices, then Defendants are liable to Plaintiff for common law fraud.

84.     Defendants deliberately or recklessly misrepresented to Plaintiff, intending that he rely upon these misrepresentations, that Plaintiff would be entitled to exercise his Options within three months of the end of his Service under the Notices if he continued to provide consulting services to Prove.

85.     Defendants deliberately or recklessly misrepresented to Plaintiff, intending that he rely upon these misrepresentations, that Prove's board of directors had agreed to reduce the Consulting Agreement to writing, and had thus ratified it, such that Plaintiff would be entitled to exercise his Options within three months of the end of his Service under the Notices.

86.     In a context in which Desai had told Plaintiff that reducing the Consulting Agreement to writing was "all set," Defendants deliberately or recklessly omitted to inform Plaintiff that the board either had concluded that the Consulting Agreement was not an

16

enforceable contract or else had not considered the issue at all, such that Plaintiff would not be entitled to exercise his Options within three months of the end of his Service under the Notices if he continued to provide consulting services to Prove.

87.     Defendants knew or recklessly should have known that these material misrepresentations and omissions were false when they made them.

88.     Plaintiff justifiably and reasonably relied upon Defendants' material misrepresentations and omissions, not knowing they were false, by providing his labor to Prove as a consultant and refraining from exercising his Options upon the termination of his full-time employment with Prove.

89.     Accordingly, if the Consulting Agreement is not an enforceable contract, and if Plaintiff is not permitted to enforce his rights under the Option Grant Notices, then Defendants' common law fraud has directly and proximately caused Plaintiff to suffer a recoverable out-of-pocket loss equal to the value of the Options.

### COUNT IV – FEDERAL SECURITIES FRAUD
### VIOLATIONS OF EXCHANGE ACT SECTION 10(b) AND RULE 10b-5(b)
### (In the Alternative)
### (Against Defendants)

90.     Plaintiff incorporates the allegations above.

91.     If the Consulting Agreement is not an enforceable contract, and if Plaintiff is not permitted to enforce his rights under the Option Grant Notices, then Defendants are liable to Plaintiff under the federal securities laws.

92.     Defendants deliberately or recklessly misrepresented to Plaintiff, intending that Plaintiff rely upon these misrepresentations, that Plaintiff would be entitled to consummate the purchase and sale of securities to him by exercising his Options within three months of the end of his Service under the Notices if he continued to provide consulting services to Prove.

93.     Defendants deliberately or recklessly misrepresented, intending that Plaintiff rely upon these misrepresentations, that Prove's board of directors had agreed to reduce the Consulting Agreement to writing, and had thus ratified it, such that Plaintiff would be entitled to exercise his Options within three months of the end of his Service under the Notices.

94.     In a context in which Desai had told Plaintiff that reducing the Consulting Agreement to writing was "all set," Defendants deliberately or recklessly omitted to inform Plaintiff that the board either had concluded that the Consulting Agreement was not an enforceable contract or else had not considered the issue at all, such that Plaintiff would not be entitled to exercise his Options within three months of the end of his Service under the Notices if he continued to provide consulting services to Prove.

95.     Defendants made these material misrepresentations and omissions with the secret knowledge that the board had not agreed to reduce to writing or ratified the Consulting Agreement; with the secret intention not to document Brown's rights as a written contract; with the secret knowledge that Prove would use the lack of documentation and board approval to dispute Brown's rights; and with the secret reservation that Prove would not perform as Prove knew or recklessly should have known that Desai had represented Prove would perform.

96.     Defendants knew or recklessly should have known that these misrepresentations were false when they made them.

97.     Plaintiff justifiably and reasonably relied upon Defendants' material misrepresentations and omissions, not knowing they were false, by providing his Service to Prove as a Consultant and refraining from exercising his Options upon the termination of his full-time employment with Prove.

98.     Defendants made these material misrepresentations and omissions in connection with the sale of a security to Brown, intentionally or recklessly inducing Brown to refrain from consummating the purchase and sale of Prove stock under the Options, and in connection with preventing Brown from taking possession of the securities that he had earned through his work for Prove, in violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder.

99.     Desai is jointly and severally liable to Plaintiff, with respect to the foregoing violations of the federal securities laws, under Section 20(a) of the Exchange Act, 15 U.S.C. § 78(a). Desai directly or indirectly controlled Prove at the time of Prove's foregoing violations of the Exchange Act and Rule 10b-5 thereunder.

100.    Accordingly, if the Consulting Agreement is not an enforceable contract, and if Plaintiff is not permitted to enforce his rights under the Option Grant Notices, then Defendants' federal securities fraud has directly and proximately caused Plaintiff to suffer a recoverable loss equal to the value of the Options.

### COUNT V – FEDERAL SECURITIES FRAUD
### VIOLATIONS OF EXCHANGE ACT SECTION 10(b) AND RULES 10b-5(a) and (c)
### (In the Alternative)
### (Against Defendants)

101.    Plaintiff incorporates the allegations above.

102.    Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, and/or (ii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

103.    By reason of the foregoing, Defendants directly or indirectly, singly or in concert, violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)].

## COUNT VI – PROMISSORY ESTOPPEL
### (In the Alternative)
### (Against Defendants)

104.    Plaintiff incorporates the allegations above.

105.    If Defendants are not liable for breach of contract, common law fraud, or federal securities fraud, then they are liable for promissory estoppel.

106.    Defendants clearly and unambiguously promised to Plaintiff, intending that he rely upon the promise, that Plaintiff would be entitled to exercise his Options within three months of the end of his Service under the Notices if he continued to provide consulting services to Prove.

107.    Defendants clearly and unambiguously promised to Plaintiff, intending that he rely upon the promise, that Prove's board of directors had agreed to reduce the Consulting Agreement to writing, and had thus ratified it, such that Plaintiff would be entitled to exercise his Options within three months of the end of his Service under the Notices.

108.    Plaintiff reasonably and foreseeably relied upon the foregoing promises, providing consulting services to Prove over multiple years and refraining from exercising his Options within three months after his full-time employment terminated.

109.    Accordingly, if Defendants are not liable for breach of contract or fraud, then Defendants' promissory estoppel has directly and proximately caused Plaintiff to suffer an out-of-pocket loss—namely, the value of his Options if he had exercised them within three months of the termination of his full-time employment with Prove.

## COUNT VII – CONVERSION
## (Against Prove)

110.    Plaintiff incorporates the allegations above.

111.    Under the Option Grant Notices, Plaintiff held a possessory right or interest in Prove's equity, though his Options and as a shareholder of Prove.

112.    Prove had dominion over and improperly and unjustly interfered with Plaintiff's possession of his ratable portion of Prove equity, in derogation of Plaintiff's rights. Prove thereby converted Plaintiff's possessory right or interest in Prove's equity.

113.    Prove thus directly and proximately caused Plaintiff to suffer damages from Prove's conversion—namely, the value of his Options if he had been permitted to exercise them at the time that Prove refused to permit him to exercise them.

## COUNT VIII – UNJUST ENRICHMENT
### (In the Alternative)
### (Against All Defendants)

114.    Plaintiff incorporates the allegations above.

115.    If Plaintiff has no adequate remedy at law, then he is entitled to equitable relief under the doctrine of unjust enrichment.

116.    Defendants have been enriched at Plaintiff's expense by obtaining and keeping for themselves the value of Plaintiff's Options and equity, as well as the Service that he provided as a Consultant to Prove. The value of Desai's equity share increased as a result of Defendants' refusal to permit Plaintiff to exercise his Options.

117.    Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the value of Plaintiff's Options and Service as a Consultant.

118.    Accordingly, if Plaintiff has no adequate remedy at law, then Defendants are obligated to disgorge to Plaintiff the value of Plaintiff's Options and equity.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the Court to enter judgment against either or both Defendants for the following relief:

A.      Compensatory damages, in an amount to be proved, in excess of $7 million;

B.      Pre- and post-judgment interest;

C.      If Defendants are found liable under applicable counts pled in the alternative, punitive damages;

D.      In the alternative, equitable relief;

E.      Costs and fees incurred in the prosecution of this action; and

F.      Such other and further relief as this Court may deem just and proper.

## **JURY TRIAL DEMANDED**


Dated: October 31, 2022                     Respectfully Submitted,

                                            **FREEDMAN NORMAND FRIEDLAND LLP**

                                            */s/ Edward Normand*
                                            Edward Normand
                                            99 Park Avenue, 19th Floor
                                            New York, NY 10016
                                            Tel: (646) 350-0527
                                            Email: tnormand@fnf.law

                                            Peter Bach-y-Rita (*pro hac vice* forthcoming)*
                                            99 Park Avenue, 19th Floor
                                            New York, NY 10016
                                            Tel: (646) 350-0527
                                            Email: pbachyrita@fnf.law
                                            *admitted in California only

                                            *Counsel for Plaintiff*