UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MATTHEW BROWN,

                Plaintiff,

-against-

PROVE IDENTITY, INC, and RODGER DESAI,

                Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _03/20/2024_

22 Civ. 9315 (AT)

**ORDER**

ANALISA TORRES, District Judge:

    Plaintiff, Matthew Brown, brings this action against his former employer, Prove Identity, Inc. ("Prove"), and its chief executive officer Rodger Desai (collectively, "Defendants"), alleging that Defendants unlawfully prevented Brown from exercising stock options in Prove. Brown asserts claims of (1) breach of contract, (2) fraud, (3) securities fraud in violation of Section 10(b) of the Securities Exchange Act, (4) promissory estoppel, (5) conversion, and (6) unjust enrichment. *See* Compl., ECF No. 1. Defendants move to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). ECF No. 28; *see* Defs. Mem., ECF No. 29.[1] For the reasons stated below, Defendants' motion is GRANTED.

## BACKGROUND[2]

    Prove, a Delaware corporation with its principal place of business in New York, "sells identity-verification services to online businesses." Compl. ¶ 3. Desai, a New York resident, is the founder and chief executive officer of Prove. *Id.* ¶ 4.

---

[1] Defendants filed a version of their motion to dismiss under seal, ECF No. 30, that is identical to the unsealed version but with five sealed exhibits attached. *See* ECF No. 57 (granting motion to seal).

[2] The following facts are taken from the complaint and "are presumed to be true for purposes of considering a motion to dismiss for failure to state a claim." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 398 (2d Cir. 2015).

From March 2013 to January 2018, Brown was a full-time employee of Prove; by the end of his employment, Brown was its vice president of product and engineering. *Id.* Over the course of Brown's employment, Prove granted him options to purchase 200,000 shares of Prove's common stock (the "Options"). *Id.* ¶ 6. The Options were granted through five separate notices (the "Option Contracts") dated March 6 and November 19, 2013; June 4 and September 24, 2014; and September 13, 2016. *Id.* The Option Contracts set forth "the type of option, the exercise price per share, the date of grant, and the vesting schedule." *Id.* ¶ 7. Each contract also states that Brown's ability to exercise the Options would expire at the earlier of either ten years from the date of grant or "[t]he date three months after the termination of [Brown's] Service for any reason other than [d]isability." *Id.* ¶¶ 8–9. The Option Contracts defined "Service" as "service as an [e]mployee, [o]utside [d]irector or [c]onsultant." *Id.* ¶ 9.

In January 2018, Brown, a United States citizen, decided to leave Prove and move to London, where he "accepted a position at startup Voxbone" and where he still is domiciled. *Id.* ¶¶ 2, 11. Prior to his departure, Brown "approached Desai," to whom he directly reported, and "told [him] about his decision." *Id.* ¶¶ 12–13. Desai "appeared to be happy for Brown," but said that "the departure of a key executive at the time would send the wrong signal to potential investors." *Id.* ¶¶ 13–14. Desai asked Brown to "continue as a [c]onsultant" and to "maintain a public image of continued full-time employment." *Id.* ¶ 15. Desai and Brown "discussed and agreed" orally that, by remaining a consultant, Brown's "vested Options would not terminate, the unvested Options would continue to vest, and Brown could exercise the Options in the future" (the "Consulting Agreement"). *Id.* This oral agreement outlined "the only consideration that Brown and Desai agreed to, or even discussed, in exchange for" Brown's consulting work. *Id.* ¶ 16. "Desai possessed full power and authority to enter into the Consulting Agreement" and

made employment decisions on behalf of Prove "without approval from any other person." *Id.* ¶ 18.

Brown ended his full-time employment with Prove on January 18, 2018. *Id.* ¶ 19. By text message sent March 15, 2018, Brown asked Desai to reduce the Consulting Agreement to writing "before the 90 days runs out." *Id.* ¶ 23. Brown claims that he did not "know[] whether such a writing was required as a legal matter," and was concerned that the deadline for him to exercise his vested options would expire on April 18, 2018. *Id.* ¶ 22. Desai responded by text an hour later, saying that he needed to check with Tom Fitzsimmons, Prove's chief financial officer, and that "we'll get it done." *Id.* ¶ 24. In another text message to Brown two weeks later, Desai said that he "[n]eed[ed] to get [Brown's] paperwork to [him] as well." *Id.* ¶ 25. By email on April 9, 2018, Brown followed up: "Any luck on the [a]dvisory paperwork? I believe we're up against the deadline on my options, so I'd like to get that bottomed out in the next couple days." *Id.* ¶ 27. On April 12, 2018, Brown followed up again by text message: "Hey Rodger, any word on the paperwork? Sorry to push but we need to get this bottomed out." *Id.* ¶ 28. Desai replied that Fitzsimmons "wants to just . . . know the scope of what u will do for us as advisor. Let's put 3 bullets together and then I can send it over." *Id.* On April 16, 2018, Brown sent an email listing seven consulting tasks, and followed up by text the next day to see if Desai had "any questions" in advance of a board meeting. *Id.* ¶ 29. Brown said in the message, "[i]f for whatever reason we're unable to finalize the deal, I'd like to ask for an extension on my options so I can work out how to purchase." *Id.* Desai replied: "of course / but we have it for approval." *Id.* Brown claims that the "it" in the message referred to the Consulting Agreement. *Id.*

By text message on April 18, 2018, referring to the board meeting, Brown asked, "How'd it go today." *Id.* ¶ 31. Desai replied, "good," then "all set." *Id.* Brown claims these messages

3

confirmed that the board had approved the Consulting Agreement and that it would be reduced to writing. *Id.* ¶ 32. On June 13, 2018, Brown emailed Desai again to ask who he could work with "to close out the paperwork." *Id.* ¶ 35. In response, Desai copied Melissa Lockhart, Prove's director of people, and told her to "get this completed." *Id.* By email on June 20, 2018, Brown asked Lockhart to "[l]et me know what you need to me to close this out." *Id.* ¶ 36. Lockhart did not respond. *Id.* On September 1, 2018, Brown again emailed Desai and Lockhart, asking, "Would it be easier if I bought out the Options?" *Id.* ¶ 37. Desai did not respond. *Id.* Brown understood Desai's lack of responsiveness as him being "overwhelmed by the burdens of running a fast-growing startup and would get to it." *Id.* ¶ 39. Brown continued to "provide substantial consulting" services through April 2020. *Id.* ¶ 38.

In November 2020, Brown's employment with Voxbone ended, and in January 2021, he "reconnected with Desai over the possibility of increasing his [s]ervice to Prove." *Id.* ¶ 40. In a phone call on January 25, 2021, Desai "offered Brown a job as [v]ice [p]resident of [s]ales [e]ngineering and proposed several consulting projects." *Id.* ¶ 41. By email on February 16, 2021, Brown "detail[ed] project ideas" but said that "he would not be able to commit to Prove full-time." *Id.* ¶ 42. In the email, Brown said, "Perhaps we keep it simple and formalize the handshake advisory agreement we had when I left—I likely [] owe you some work as part of that arrangement." *Id.* Desai "did not dispute the formation or existence" of the Consulting Agreement, either in responding to the email or in communications with Brown over the next two months about several new business opportunities for Prove. *Id.* ¶¶ 43–45.

In June 2021, Brown decided to exercise the Options for tax purposes and, on June 21, 2021, he emailed Desai asking how to do so. *Id.* ¶ 46. After six months of communications where Brown repeatedly followed up, *id.* ¶¶ 48–56, Desai stated by email on December 5, 2021,

that "the exercise window had expired," *id.* ¶ 57.  Brown replied that the Consulting Agreement meant that the exercise window was still open, and asked Desai to check the minutes from the relevant board meeting.  *Id.* ¶ 58.  Desai did not respond.  *Id.*  By email on February 14, 2022, Brown emailed Desai once more.  *Id.* ¶ 60.  Prove's general counsel, Melanie Grace, replied, "You did not exercise your options with 90 day of departing the company, which was three years ago.  The options were cancelled and there are no options to exercise."  *Id.* ¶ 61.  Grace asked Brown to have his lawyer contact her if he wished to speak further.  *Id.*

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief."  *Twombly*, 550 U.S. at 558.  The Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff."  *Koch v. Christie's Int'l. PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  That tenet, however, does not apply to legal conclusions.  *Iqbal*, 556 U.S. at 678.  Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.

## DISCUSSION

I. <u>Diversity Jurisdiction</u>

As an initial matter, Brown invokes this Court's jurisdiction through federal question jurisdiction, 28 U.S.C. § 1331; diversity jurisdiction, *id.* § 1332; and supplemental jurisdiction,

*id.* § 1367. Compl. ¶ 5. An American citizen who is domiciled abroad is considered "stateless" for the purpose of diversity jurisdiction. *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 828–29 (1989). In such a circumstance, a party's "'stateless' status destroy[s] complete diversity," and § 1332 cannot be satisfied. *Id*. Subject matter jurisdiction is not waivable, and a lack of subject matter jurisdiction may be raised at any time, by a party or a court *sua sponte*. *See Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012). Because Brown is a United States citizen domiciled abroad, Compl. ¶ 2, he cannot invoke diversity jurisdiction.

Brown's claims, therefore, depend on the Court having federal question or supplemental jurisdiction. A court may decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Only Brown's securities fraud claims arise under federal law and can be the basis for original jurisdiction. Therefore, the Court shall address those claims first before deciding whether to exercise supplemental jurisdiction.

II.     Securities Fraud Claims (Counts Four and Five)

Brown alleges that Defendants violated Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) promulgated thereunder, 17 C.F.R. § 240.10b–5(a) & (c). *See* Compl. ¶¶ 90–103. "Section 10(b) . . . and the Securities and Exchange Commission's Rule 10b–5 prohibit making any material misstatement or omission in connection with the purchase or sale of any security." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014). "To state a claim under Section 10(b) and Rule 10b–5, a plaintiff must allege: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Lottery.com,*

*Inc. Secs. Litig.*, No. 22 Civ. 7111, 2024 WL 454298, at *12 (S.D.N.Y. Feb. 6, 2024) (quotation marks and citation omitted). Defendants argue that the alleged misrepresentations were not made "in connection with the purchase or sale of securities." Defs. Mem. at 22–23. The Court agrees.

Securities include options to purchase securities. *See Wharf (Holdings) Ltd. v. United Intern. Holdings, Inc.*, 532 U.S. 588, 593–94 (2001). "If an individual receives an award of [] stock options . . . in exchange for accepting employment, then . . . that individual might be found to have made a 'purchase' for Exchange Act purposes." *Kinsey v. Cendant Corp.*, No. 04 Civ. 582, 2004 WL 2591946, at *8 (S.D.N.Y. Nov. 16, 2004) (citing *Yoder v. Orthomolecular Nutrition Inst.*, 751 F.2d 555, 558–61 (2d Cir. 1985)).

Section 10(b), however, "must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b)." *SEC v. Zandford*, 535 U.S. 813, 820 (2002). Section 10(b)'s "in connection with" requirement "mandates that the alleged fraud concern the fundamental nature of securities: namely, the characteristics and attributes that would induce an investor to buy or sell the particular securities." *Rodgers-King v. Candy Digital Inc.*, No. 23 Civ. 2591, 2024 WL 382092, at *3 (S.D.N.Y. Feb. 1, 2024) (internal quotation marks and citation omitted). Therefore, Section 10(b) does not cover disputes over a party's "fail[ure] to carry out a promise to sell securities," *Zandford*, 535 U.S. at 823, or "refusal to transfer promised shares," *Vekaria v. Mthree Corp. Consulting, Ltd.*, No. 22 Civ. 3197, 2023 WL 6387275, at *7 (S.D.N.Y. Sept. 30, 2023).

In *Rodgers-King v. Candy Digital, Inc.*, a plaintiff alleged that he was induced to start his employment through a grant of stock options and that, after the company made material misrepresentations about his employment, he was terminated before the options could vest. 2024

7

WL 382092, at *1–2. The court dismissed the plaintiff's securities fraud claim because "the alleged misrepresentations [were] unrelated to the value of [the] stock options as the misrepresentations solely concern[ed] [the plaintiff's] position and the resources he would have to perform for" his job. *Id.* at *4 (internal citations omitted).

Brown's allegations are similar: He claims that Defendants made material misrepresentations related to his continued employment with the company, which then affected the timeframe by which he could exercise the Options. Compl. ¶¶ 92–94. Defendants' alleged misrepresentations did not concern the value of the Options. Rather, Brown claims that they "failed to provide the shares in accordance with the contested" Options Contracts. *Lankau v. Luxoft Holding, Inc.*, 266 F. Supp. 3d 666, 679 (S.D.N.Y. 2017). Such allegations are insufficient to state a securities fraud claim. *Id.*; *accord Vekaria*, 2023 WL 6387275, at *7.

Brown offers three arguments to support his allegations. First, he contends that Defendants sold him the Options "while never intending to honor its agreement in the first place." *Zandford*, 535 U.S. at 823; *see* Pl. Opp. at 15, ECF No. 31. "Sell[ing] an option while secretly intending not to permit [its] exercise" is covered by Section 10(b) because it is misleading as to the option's value. *Wharf*, 532 U.S. at 596. But, Brown fails to allege that Defendants did not intend to provide the options when they entered into the Options Contracts between 2013 and 2016. Material misrepresentations made "after the [Options Contracts] [are] entered into . . . do not support a claim for securities fraud under Section 10(b)." *Mindspirit, LLC v. Evalueserve Ltd.*, No. 15 Civ. 6065, 2016 WL 11707410, at *11 (S.D.N.Y. Sept. 16, 2016); *Kinsey*, 2004 WL 2591946, at *8 (holding that a "misrepresentation concerning a security *already* purchased or sold" does not qualify under Section 10(b)).

8

Brown next argues that Defendants acted fraudulently with regard to the Consulting Agreement, which he claims was a "new agreement" to purchase securities in which he agreed to provide labor for Prove in exchange for a "new option." Pl. Opp. at 16–17. Brown's argument is contradicted by the complaint, in which he claims that the Consulting Agreement "incorporated by reference the Option [Contracts]," and extended his "Service" under the Contracts, prolonging his ability to exercise the Options. Compl. ¶¶ 15–16. The Consulting Agreement, therefore, does not constitute a purchase or sale of securities, as the relevant purchase had already occurred.

Finally, Brown contends that the sale of the Options "continue[d] to occur" because Defendants had not yet transferred the shares to him, and that fraud during a sale is actionable. Pl. Opp. at 15. Brown cites only one case for this proposition, *Horst v. W.T. Cabe & Co., Inc.*, No. 76 Civ. 1782, 1977 WL 1051 (S.D.N.Y. Oct. 31, 1977). *Horst* is inapplicable to Brown's situation. The plaintiffs in *Horst* instructed the defendants to purchase 500 shares of stock at a certain price; the defendants agreed and claimed to have done so—but they in fact failed to purchase the stock until a later time, at which point the price had increased. *Id.* at *1–2. There, the defendants' statements that they had purchased the shares—after the plaintiffs' instructions and before the actual purchase—were sufficient for a nexus to the securities purchase because the sale was still pending. *Id.* at *7. The same is not true here, where Brown completed his purchase of the relevant securities—the Options—upon executing the Options Contracts.

In sum, Brown alleges that Defendants are unlawfully refusing to transfer shares owed to him under the Options Contracts. Brown's allegations may sound in a common-law breach-of-contract or fraud claim, but they do not "concern the fundamental nature of securities." *Rodgers-King*, 2024 WL 382092, at *3.

Accordingly, Defendants' motion to dismiss the securities fraud claims is GRANTED.[3]

III.   State-Law Claims

Because the Court dismisses Brown's only federal claims under Rule 12(b)(6), the Court declines to exercise supplemental jurisdiction over his state-law claims for breach of contract, fraud, promissory estoppel, conversion, and unjust enrichment, and such claims shall be dismissed without prejudice to renewal in state court. *See* 28 U.S.C. § 1367(c)(3); *Heard v. MTA-Metro North Commuter R.R. Co.*, No. 02 Civ. 7565, 2003 WL 22176008, at *3 (S.D.N.Y. Sept. 22, 2003) ("The interests of judicial economy, convenience, and fairness counsel against hearing state law claims when federal claims against a party are dismissed at an early stage in the litigation.").

Accordingly, Defendants' motion to dismiss Brown's state-law claims is GRANTED.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.  The Clerk of Court is directed to terminate the motions at ECF Nos. 27, 28, and 30, enter judgment as to Brown's securities fraud claims, and close the case.

SO ORDERED.

Dated: March 20, 2024
       New York, New York

_____
ANALISA TORRES
United States District Judge

---

[3] Defendants also argue that Brown has not adequately alleged scienter or reliance. Defs. Mem. at 17–21. The Court shall not reach these arguments.